

**Dated: June 09, 2016.**

_____
**TONY M. DAVIS
UNITED STATES BANKRUPTCY JUDGE**

_____

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | No. 13-11818-TMD |
| STERRY INDUSTRIES, INC., | § | |
|     Debtor. | § | Chapter 7 |
| | § | |
| RON SATIJA, CHAPTER 7 TRUSTEE, | § | |
|     Plaintiff, | § | |
| | § | Adv. Proc. No. 15-01108-TMD |
| v. | § | |
| | § | |
| C-T PLASTER, INC., aka CEN-TEX | § | |
| PLASTER, INC., et al. | § | |
|     Defendants. | § | |

## MEMORANDUM OPINION

Summers are hot in Texas, so pools are a hot item. But not hot enough to help a pool installer named Sterry avoid bankruptcy. Shortly before bankruptcy, Sterry paid a debt to Cen-Tex, a subcontractor, and the bankruptcy trustee now seeks to recover that payment as preferential. Can Cen-Tex establish an ordinary course of business defense to the trustee's suit even though a change in its ownership also changed the course of its business with Sterry?

1

I. **BACKGROUND**

For some time prior to bankruptcy, Sterry Industries, Inc. ("Sterry") used Hines/Harvey Interests, LLC dba Cen-Tex Plaster, Inc. ("Cen-Tex") to put the permanent liner in pools constructed by Sterry. Sterry did so by faxing a work order to Cen-Tex specifying where and when to install the liner. Cen-Tex then installed the liner and sent an invoice to Sterry. As soon as the liner was installed, Sterry filled the pool and then looked for payment from the owner.

Up until six months before Sterry's bankruptcy, each invoice gave a payment deadline of "Net 30," and both parties understood that to mean payment was due within 30 days. Sterry would generally mail Cen-Tex a check, but sometimes a representative from Cen-Tex would pick up the check at Sterry's offices.

Then, about six months before Sterry's bankruptcy, Cen-Tex was sold to a new owner, and the business practice between Cen-Tex and Sterry changed in two ways. First, the invoice payment deadline changed from "Net 30" to "Due upon Receipt," but witnesses for both parties testified that this still meant due within 30 days.[1] Second, instead of waiting for Sterry to mail the check, Cen-Tex would send a representative to pick up each check at Sterry's offices. These two changes in business practice were consistently observed during the six month period from the change in ownership to the bankruptcy filing. Thus, the course of business during the three months right before bankruptcy, the preference period, was the same as it was for the prior three month period but differed somewhat from the course of business before the change in Cen-Tex's ownership.

At trial, Sterry's business manager, Laura Terry, testified that after the ownership change she felt pressured to pay Cen-Tex because it now sent someone to pick up all payments in

---

[1] James Harvey, and co-owner of Cen-Tex, and Carri Walter, office manager and bookkeeper, testified for Cen-Tex; Laura Terry, business manager for Sterry, testified for the Trustee.

2

person. Terry said she remembers this period well because this collection practice caused her stress. In observing her demeanor on direct and cross examination, however, the Court inferred that she was likely also stressed because her employer—which was also her son's company—was approaching bankruptcy. Terry also testified that Sterry sometimes allowed other vendors to pick up checks on Friday afternoons.

No one submitted a chart summarizing the payment history prior to the six months before bankruptcy. Because of the relevance of this payment history, the Court used the exhibits admitted at trial to create this chart:

| Invoice Date | Terms | Check Date | Days between Invoice & Check |
|---|---|---|---|
| 9/25/12 | Net 30; Due: 10/25/12 | 1/15/13 | 112 |
| 10/18/12 | Net 30; Due: 11/17/12 | NR[2] | NR |
| 10/29/12 | Net 30; Due: 11/28/13 | 12/26/12 | 58 |
| 11/20/12 | Net 30; Due: 12/20/12 | 1/31/13 | 72 |
| 12/25/12 | Net 30; Due: 1/24/13 | 2/27/13 | 64 |
| 12/28/12 | Net 30; Due: 1/27/13 | 2/27/13 (partial) | 61 |
|  |  | 3/5/13 (remaining) | 67 |
| 1/5/13 | Net 30; Due: 2/4/13 | 3/5/13 | 59 |
| 1/11/13 | Net 30; Due: 2/10/13 | 3/5/13 | 53 |
| 1/25/13 | Net 30; Due: 2/24/13 | 4/2/13 | 67 |
| 1/31/13 | Net 30; Due: 3/2/13 | 4/2/13 (partial) | 67 |
|  |  | 4/11/13 (remaining) | 70 |
| 2/4/13 | Net 30; Due: 3/6/13 | 4/11/13 | 66 |
| 3/22/13 | Net 30; Due: 4/21/13 | 3/22/13 | 0 |
| 3/22/13 | Net 30; Due: 4/21/13 | 3/22/13 | 0 |
| 4/29/13 | Due Upon Receipt | 4/30/13 | 1 |
| 5/3/13 | Due Upon Receipt | 5/7/13 | 4 |
| 5/13/13 | Due Upon Receipt | 5/22/13 | 9 |
| 5/24/13 | Due Upon Receipt | 6/10/13 | 17 |
| 6/17/13 | Due Upon Receipt | 6/24/13 | 7 |
| 6/17/13 | Due Upon Receipt | 7/9/13 | 22 |
| 6/28/13 | Due Upon Receipt | 7/12/13 | 14 |
| 6/28/13 | Due Upon Receipt | 7/16/13 | 18 |

---

[2] No Record

According to the invoice records, prior to the ownership change Sterry was generally not paying Cen-Tex's invoices within 30 days.[3] Records from September of 2012 to February of 2013 show payments made between 53 and 112 days after the invoice date.[4] This changed in March of 2013 when Sterry paid the last two invoices, sent by Cen-Tex under its prior owner, on the invoice date.[5] During the first three months after Cen-Tex changed owners, Sterry paid the first invoice the next day, but paid the next four invoices within 4, 9, 17, and 7 days.[6] During the preference period, the time gap between the invoice and payment dates lengthened to 22, 14, and 18 days.[7]

## II. ANALYSIS

To prevent unequal treatment between creditors, subsection 547(b) of the Bankruptcy Code allows a trustee to avoid and recover a preferential transfer, which is any transfer of a debtor's property made to a creditor, for debt owed by the debtor, while the debtor was insolvent. Arbitrarily, the only payments subject to this "claw-back" provision are those made during the preference period.[8] This means that if the payments happen to fall in that three month window, the creditor might actually have to refund payments made on valid debt to a company that may now be unable to repay that debt in full.[9]

The creditor can avoid this trap, however, if it can establish one of the affirmative defenses listed in subsection 547(c).[10] These defenses are premised in part on the notion that

---

[3] Pl. Ex. 9.
[4] Id. at 1-27.
[5] Id. at 28-31.
[6] Id. at 32-40; 43-44.
[7] Id. at 41-42; 45-48.
[8] 11 U.S.C. § 547(b). Subsection (b)(4)(B) extends this period to one year for payments to insiders. 11 U.S.C. § 547(b)(4)(B).
[9] Cen-Tex stipulated that all the prima facie elements of a preference under subsection 547(b) were met except subsection 547(b)(5), but the Trustee provided impressive proof on this issue, Cen-Tex offered none, and so the Court finds that the Trustee carried his burden.
[10] 11 U.S.C. § 547(c).

while we do not want to encourage a race to the courthouse on the eve of bankruptcy, we still want vendors and customers to transact with troubled businesses.[11] Here, Cen-Tex admits that Sterry paid it $18,526 during the preference period, but asserts the ordinary course of business defense.

To establish this affirmative defense, Cen-Tex first has the burden of proving that each payment was "of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee."[12] This element is easily satisfied. The payments at issue were made for debt incurred in the ordinary course of business between Sterry and Cen-Tex: adding liners to pools built by Sterry. Cen-Tex must next show that the payments were either (1) "made in the ordinary course or financial affairs of the debtor and the transferee"—the so-called "subjective prong"—*or* (2) "made according to ordinary business terms"—the so-called "objective prong."[13] As previously noted by this Court, Cen-Tex only needs to prove one of these prongs.[14]

When considering the "subjective prong," courts look at "'whether the transactions between the debtor and the creditor before and during the ninety-day period are consistent.'"[15] Several factors inform the analysis, including: "'"the length of time the parties were engaged in the transaction in issue, whether the amount or form of tender differed from past practices, whether the creditor engaged in any unusual collection activity, and the circumstances under

---

[11] ELIZABETH WARREN, JAY WESTBROOK, KATHERINE PORTER & JOHN POTTOW, THE LAW OF DEBTORS AND CREDITORS: TEXT, CASES, AND PROBLEMS 474-75 (Wolters Kluwer Law & Business, 7th ed. 2014).

[12] 11 U.S.C. § 547(c)(2); 11 U.S.C. § 547(g) ("[T]he creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the non-avoidability of a transfer under subsection (c) of this section.")

[13] 11 U.S.C. § 547(c)((2)(A-B); *In re KLN Steel Products Co., LLC*, 506 B.R. 461, 468-69 (Bankr. W.D. Tex. 2014).

[14] *KLN*, 506 B.R. at 469.

[15] *Id.* (citing *Goldberg v. Graybar Elec. Co. (In re ACP AmeriTech Acquisition)*, No. 10–9029, 2012 WL 481582 at *8 (Bankr. E.D.Tex. Feb. 14, 2012) (quoting *Lightfoot v. Amelia Maritime Svcs., Inc. (In re Sea Bridge Marine, Inc.)*, 412 B.R. 868, 872 (Bankr. E.D.La. 2008)).

which the payment was made (i.e. whether the creditor took advantage of the debtor's weak financial condition).'"[16] In a prior case with a similarly short payment history, this Court compared the "timing and manner of payments made before the [p]reference [p]eriod with the timing and manner of those made during the [p]reference [p]eriod."[17]

According to the payment records, under the prior ownership, payments were generally late until March 22, 2013 when Cen-Tex created two invoices that were paid by Sterry on the same day. Shortly after that, the new owner took over. Thereafter, the timing and manner of payments between Sterry and Cen-Tex in the three months prior to the preference period was substantially the same as during the preference period: someone would come in and pick up the check for Cen-Tex within a few weeks of the invoice date. If the Court were to look at the entire payment history between Cen-Tex and Sterry, without considering the ownership change, the payments at issue might look preferential because Sterry began paying its invoices timely only three months before the preference period. But the Court cannot ignore the ownership change because with that change came an agreed change in the business relationship between the two entities. Since this new business relationship began three months prior to the preference period, that three-month period of time is the relevant baseline to compare to the preference period.

Thus, the Court will look at the timing and manner of payments between Sterry and Cen-Tex under its new ownership. The records show that the timing and manner of payments made in the three months prior to the preference period and those made during the preference period were substantially the same—they were all made within 30 days. Moreover, the time period between the invoice and check dates actually increased during the preference period. Thus, the subjective analysis suggests that these final three payments were made in the ordinary course of business.

---

[16] *In re KLN Steel Products Co., LLC*, 506 B.R. 461, 469 (Bankr. W.D.Tex. 2014) (*quoting Compton v. Plains Mktg., LP (In re Tri–Union Dev. Corp.)*, 349 B.R. 145, 150 (Bankr.S.D.Tex.2006) (collecting cases)).

[17] *Id.* at 480.

The Trustee contends that changing the invoice to read "Due upon Receipt" instead of "Net 30" took the payments on those invoices outside of the ordinary course. According to witnesses for both parties, however, "Due upon Receipt" meant the same thing as "Net 30": Sterry had to pay the invoice within 30 days. Therefore, the Court finds that this language change did not alter, and so was not outside, the course of business between Cen-Tex and Sterry.

The Trustee also argues that sending someone to collect checks in person is a coercive practice that would take the payments outside of the ordinary course of business. Examples of practices courts have found "coercive" include:

- imposing and then vigorously enforcing credit limits a month before the preference period, which the bankruptcy court found to be "extreme,"[18]

- threatening to shut down the debtor unless payment is made;[19] and

- terminating contracts and refusing to perform under an agreement until payment is made.[20]

But the test is subjective and even these actions may be within the ordinary course, if consistent with the dealings between the parties.[21]

While sending someone to pick up a check in person is certainly more "coercive" than sending an invoice and demanding a check in the mail, the Court finds that this collection method was not so coercive here as to take these payments outside of the ordinary course of business. For one, this practice began with the ownership change three months before the preference period, and thus became ordinary to these parties. Also, and perhaps more tellingly, collections *slowed down* during the preference period, which suggests that sending a

---

[18] *In re Hechinger Inv. of Delaware, Inc.*, 489 F.3d 568, 578 (3rd Cir. 2007).
[19] *In re Jotan, Inc.*, 264 B.R. 735, 754 (Bankr. M.D. Fl. 2001).
[20] *In re 360networks (USA) Inc.*, 338 B,R. 194, 211 (Bankr. S.D.N.Y. 2005).
[21] *See e.g. In re Archway Cookies*, 435 B.R. 234, 243-45 (D. Del. 2010) (creditor's refusal to ship goods until debtor brought its account current was within the ordinary course of business between the parties.) *aff'd* 511 B.R. 726 (D. Del. 2013).

representative to pick up checks was not in fact coercive. Therefore, the Court finds that Cen-Tex has satisfied the subjective prong of the ordinary course of business analysis, so the Trustee cannot avoid the payments.

The practice of picking up checks in person might also be considered ordinary course under an objective analysis. According to the Fifth Circuit, "'ordinary business terms' refers to. . . the practices in which firms similar in some general way to the creditor in question engage, and . . . only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope" of this prong. [22] Here, Terry testified that other vendors picked up checks from time to time and that Cen-Tex under its prior ownership sometimes sent a representative to pick up checks. Although Terry was bothered when Cen-Tex sent a representative to pick up payments in person, this practice by itself does not, based on her own testimony, seem extraordinary in this industry.[23]

### III. CONCLUSION

As the payments made during the preference period were within the ordinary course of business between Sterry and Cen-Tex (under its new ownership), the Trustee cannot avoid the payments.

---

[22] *Gulf City Seafoods v. Ludwig Shrimp Co., Inc. (In re Gulf City Seafoods, Inc.),* 296 F.3d 363, 368 (5th Cir. 2002) (citing *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1032–33 (7th Cir.1993) (Posner, J.)).

[23] The Court does not have enough evidence to determine whether the entire payment process between Cen-Tex and Sterry was customary in the industry. Although Cen-Tex witnesses testified that Cen-Tex used the same invoice process for the Sterry transactions that it used for transactions with other customers, no proof was offered as to the timing of payments made by those other customers.